UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-14024-CR-LEIBOWITZ/MAYNARD

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

LUIS ESCOTO,

        Defendant.
_____/

## DEFENDANT'S POSITION PAPER ON SENTENCING

COMES NOW defendant, Luis Escoto, by and through his appointed counsel, Kafahni Nkrumah, pursuant to Federal Rule of Criminal Procedure 32, Local Criminal Rule 88.8, and USSG § 6A1.2(b), and submits the following position with respect to sentencing in this case.

**SENTENCING POSITION PAPER**

Mr. Escoto respectfully request this court take into consideration all the 18 USCA § 3553(a) factors and sentence him to a sentence of 240 months, to be followed by a term of fifteen years of supervised release. Mr. Escoto believes that this sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing within 18 USC § 3553(a).

Mr. Escoto would like this court to be aware that his life experiences are not being offered to this court as an excuse for his conduct. It is being offered as mitigation evidence, which United States Supreme Court case law, and statutory authorities clarifies, "… is not being provided as an excuse or justification for engaging in criminal conduct, but rather for the purpose of mitigation as to the length of sentence or type of punishment to be imposed as a result of that criminal conduct." See *Lockett v. Ohio*, 438 U.S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); See also, 18 U.S.C. § 3661 and 21 U.S.C. § 850.[1]

## *The Offense Circumstances*

Mr. Escoto and the victim in this case meet, were co-workers, at Olive Garden's Restaurant in Jensen Beach, Florida. As co-workers they struck up a friendship that encompassed them talking to each other frequently while at work. As Mr. Escoto's plea and allocution has admitted, that work friendship turned into something more.

On January 30, 2023, the mother of the victim contacted a Martin County Sheriff's Office (MCSO) school resource officer because of sexually charged text message exchanges, with an adult male later identified as Mr. Escoto, that she found while going through her daughters iCloud account. On February 1, 2023, law enforcement officers began contacting Mr. Escoto pretending to be the victim. After a series of text messages between law enforcement and Mr. Escoto. He arranged to

---

[1] Evidence about the defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, concurrence).

2

meet with the victim (law enforcement) at a park near the victim's school, a place where they had meet before.

When Mr. Escoto arrived at the park, he was arrested and taken into custody by MCSO officers. While in custody at the scene, Mr. Escoto was read his Miranda rights, and after waiving his Miranda rights, Mr. Escoto gave a full statement of his conduct to the officers. During that interrogation he also consented to the seizure and search of his electronic equipment, in the car and at his residence, even going as far as showing them exactly how to get into the phone, and eventually directing them to the video that forms the basis of this charge, back at the station when the deputies were having difficulty getting into the electronic device.

On May 9, 2024, Mr. Escoto pled guilty to count four of a six-count indictment, charging him with production of visual depictions of the sexual exploitation of a minor. He has accepted full responsibility for his conduct and has fully allocated to this Court.

### *A.*     Mr. Escoto's Personal Circumstances

Mr. Luis Escoto is a twenty-eight-year-old, Honduran American man, born in Fort Pierce, Fl., months after his mother left Honduras. Mr. Escoto's parents, Mr. Medardo Escoto and Ms. Maria Angela Rivas (nee: Rivas Alas), were not married when Mr. Escoto was born, his mother effectively ending their relationship when she relocated to America months before he was born. In speaking with Luis' mother, Ms. Rivas, about this period she remarked that "the situation back home was not good.

Luis' father was someone who often became drunk and violent. Economically, it was difficult to support a family, so I decided to leave and come to America."

Ms. Rivas described her son as a "good person who was also a good son. When Luisito was younger, he was very restless, and he had an endless supply of energy. He would be all over the place and would be into all things. To me, I think he started to grow out of it in the sixth grade, but I don't think my mother would agree with me. My mother would always say that Luisito had way too much energy and was hard to handle sometimes, but that he was a good boy and always willing to help around the house, when he would go to Honduras to visit for the summer."

Ms. Rivas also described Luis as a responsible individual who helped care for his younger brothers when he was younger. "Luisito had a very 'healthy' childhood. In our home we didn't allow our boys to be out in the streets. We didn't allow our sons to watch television programs or movies with violence or sexual content. We knew who their friends were, and we went to church as a family. We had a very stable household."

Since the age of one and one-half years old, Mr. Escoto has known the man he calls, his father, Mr. Carlos Lachan-Chaclan. In speaking with Mr. Lachan, he too considers Mr. Escoto to be his son. "I've been his father since he was one and a half years old. I have been there when he was sick, when he needed help in school, I have provided for him from the moment I meet his mother. He is my son and I love him like he is my own." According to Mr. Lacan, he and Luis have a very close relationship. "He knows he can count on me for anything, including emotional support and money.

He is a good young man who is respectful and was just beginning to become a man. What he is going through now breaks my heart, but I will be there for him through it all."

Although Mr. Escoto was born in the states, as a first generation Honduran American, by mere months, he was raised in a Honduran home, within a community that was heavily influence by Honduran influences, and further indoctrinated into the Honduran customs when he would go back to Honduras, every summer until the age of twelve, with his grandparents and his father. Especially important to note is his community's acceptance of the age-gap-couple-phenomenon. The examples abound, here in the states as well as back in Honduras, of older male adults, dating and marrying (most times here in the states informally), young girls sixteen and seventeen years old. In his own family the examples for Luis abound, his grandfather is twenty years older than his grandmother, when his grandfather married his grandmother, he was thirty-six-years, and she was only sixteen years old. His biological father was also much older than his mother.

In speaking with Mr. Escoto, he states that his biological father was not involved in his life much at all. "I was raised by my mother, and I thought my stepfather was my father until the age of ten years old, when I meet my biological father during one of my summer trips to Honduras. After I stopped being going to Honduras in the summer, he stopped being a part of my life. My stepfather is my father, he is the person who raised me and has always been there when I needed him. He treated me like I was his son, and until I ten years old I believed that he was, in

5

fact, my only father. Finding out that he wasn't my real father was devasting to me. It took me awhile to get over the fact that my father was not my biological father. I was mad at my mother for a long time after that, but I never stopped loving my father."

In describing his childhood, Mr. Escoto stated that he had a good life as a child. "My childhood was 'happy and adventurous.' I spent my summers in Honduras with my family until the age of twelve. I meet my biological father when I was ten years old, but we didn't get along too well because he was always intoxicated. I loved going to my grandparents home each summer as a child. I can remember playing with my cousins and meeting my other brothers and sisters from my father. When I went to Honduras, I spent a lot of time with my grandmother, especially when my grandfather was at work."

"When I was in school, I was a decent student. When I applied myself, I could get good grades, but then there were times when it was obvious that I wasn't putting in the effort. Often, I would find myself drifting off when I was in class and not paying much attention. Sometimes I could complete my work without any interruptions, but for the most part it was a struggle. I have held down a couple of jobs, I was looking for new employment when I was arrested, but I have always worked, since I was a young man, helping my family in the fields in Honduras and helping my family here."

"I know what I did was wrong, and I know that I have to pay the consequences for my actions. But I would like the court to know, and the victim, that I never intended to victimize anyone. A work friendship turned into much more. I developed

6

feelings and believed that she also had feelings for me. I may have been pushing myself to believe in the fantasy of a future, knowing that my actions were wrong. I was wrong for that and understand that I must not pay the price for my foolish fantasy."

### B. 18 U.S.C. § 3553(a) in considering Mr. Escoto's sentence.

The mandate of 18 U.S.C. § 3553(a) is, of course, for the court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in paragraph two of that same statute. In *United States v. Chavez*, 584 F.3d 1354, 1364 (11th Cir. 2009), the Eleventh Circuit summarized the factors that a sentencing court must consider:

> "Post *Booker*, the imposition of a sentence by the district court in a criminal case … involves a two-step process. First, the district court must still determine the appropriate sentencing range under the guidelines. This step includes the consideration and application of applicable departures as authorized by the Guidelines or statute. Second, the district court must then consider the various factors enumerated in 18 U.S.C. §3553(a) in ultimately arriving at a reasonable sentence.

See also, *United States v. Talley*, 431 F.3d 784, 787 (11th Cir. 2005) ("The § 3553(a) factors include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the kinds of sentences available; (6) the sentencing guidelines range; (7) pertinent policy statements of the Sentencing Commission; (8) the need to avoid unwanted sentencing disparities…. .

7

In Mr. Escoto's case, it is the circumstances of his current offense, the circumstances of his life, and his personal characteristics that justifies a sentence of two hundred and forty months, with a period of supervised release of fifteen years to follow. Mr. Escoto has taken full responsibility for his actions, evidenced by his willingness to plead guilty before trial.

### 1. §3553(a) Factors

This Court's obligation to consider carefully, the 18 U.S.C. § 3553(a)(2) factors need for Mr. Escot's sentence to "reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and also "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, is an obligation that is imposed by law. 18 U.S.C. § 3553(a)(2).

Excessively long sentences, however, fail to reflect the seriousness of the offense, undermine respect for the law, and fail to provide just punishment. *See United States v. C. R.*, 792 F.Supp.2d 343, 516 (E.D.N.Y. 2011) ("A sentence must be proportional to the defendant's crime. A sentence that is disproportionately long in relation to the offense is unjust and fails to promote respect for the law); *see also United States v. Rogers*, 960 F.2d 1501 (10th Cir. 1992) (A sentence must be proportionate to the crime committed, and if the sentence is so disproportionate to the crime as to shock the moral sense of the community, the sentence is impermissible). There is no reason to believe that respect for the law will increase if

8

a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491 (N.D. Ohio 2012) (While a five-year mandatory prison term may be less cruel than life in prison, as applied in cases like this one, it may well constitute "cruel and unusual punishment.").

In the current case the admonition observed by the court in *Marshall* is well taken. Mr. Escoto was not prolling the high school corridors looking for young girls to date. He meets the victim while they were both working at Olive Garden in Jensen Beach. Like so many other unexpected relationships, this one developed after both parties spent time getting to know each other and becoming friends. The two-hundred-forty-month sentence may not be a life sentence, but in a case such as this, where the victim was approximately five months short of the age of consent, the sentence in this case is more than sufficient to satisfy the commands of §3553(a).

### A. *The Sentencing Guidelines for Child Pornography*

The guidelines for child pornography cases are inflated and out of date. Indeed, in the 2012 U.S. Sentencing Commission's Report to Congress regarding federal child pornography offenses, the Commission itself noted that these guidelines "are flawed and in need of repair." *United States v. Mallatt*, 2013 WL 6196946 (D. Neb. Nov. 27, 2013) (citing USSC, Report to Congress: Federal Child Pornography Offenses 320-26 (Dec. 2012) ("USSC Report").[2]

---

[2] The Department of Justice, too, has similar concerns regarding these guidelines. In

In 2021, The Sentencing Commission updated and expanded on the 2012 USSC Report, analyzing changes (or lack thereof) to the guidelines subsequent to the publishing of the Report. *See* USSC Update, Federal Sentencing of Child Pornography: Non-Production Offenses (June 2021) ("USSC Update"). The USSC Update indicates that based on the findings of the USSC Report, the Commission concluded that the non-production child pornography sentencing scheme should be revised to account for technological changes in offense conduct, emerging social science research about offender behavior, and variations in offender culpability and dangerousness. *Id*. at 8.

Despite the recommendations, to date, Congress has not implemented the Commission's statutory or guidelines recommendation. "Therefore, § 2G2.2 remains largely unchanged, with the guideline enhancements for non-production child pornography offenders at issue in the 2012 Child Pornography Report still in effect." *Id*. at 9. Despite the recommended changes, the guidelines brought to Congress's attention by the Commission in 2012 are still being used in Mr. Escoto's case today.

2. ***Mr. Escoto's Health and Age in Considering his Sentence.***

When balancing the §3553(a) factors, the possible health consequences from incarceration and Mr. Escoto's age also cuts in favor of his request for a sentence of sixty months, with a period of supervised release to follow. Mr. Escoto suffers from

---

2013, the DOJ submitted a letter to the Sentencing Commission agreeing with an earlier Commission report suggesting that § 2G2.2 "may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness." *See United States v. Mallat*, 2013 U.S. Dist. LEXIS 168777 *11 (D. Neb. 2013).

10

ADHD,[3] anxiety, and depression (See draft psr pg. 14, ¶¶ 56, 57), and his health will be negatively impacted further from the stressors placed on the body because of incarceration. In an online article by the Prison Policy Initiative entitled, Research Roundup: Incarceration can cause lasting damage to mental health, the article talks about the debilitating effects of incarceration:

> We often talk about the disturbingly high numbers of people with mental health disorders locked up in prisons and jails. But less attention is paid to the ways in which incarceration itself perpetuates this problem by creating and worsening symptoms of mental illness. Research shows that, while it varies from person to person, incarceration is linked to mood disorders including major depressive disorder and bipolar disorder.
>
> The carceral environment can be inherently damaging to mental health by removing people from society and eliminating meaning and purpose from their lives. On top of that, the appalling conditions common in prisons and jails — such as overcrowding, solitary confinement, and routine exposure to violence — can have further negative effects. Researchers have even theorized that incarceration can lead to "Post-Incarceration Syndrome," a syndrome similar to PTSD, meaning that even after serving their official sentences, many people continue to suffer the mental effects.[4]

The mental effect of incarceration is not the only possible health consequence of incarceration. Incarceration also takes a physical toll on a person's body. In a study in the Annual Review of Sociology[5] the authors documented a negative relationship

---

[3] See Exhibit 2, Sealed Document
[4] K.R. Quandt and Alexi Jones, Research Roundup: Incarceration can cause lasting damage to mental health, Prison Policy Initiative, (2021), http://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/

[5] M. Massoglia and W.A. Pridemore, Incarceration and Health, 41 Annual Review of Sociology, 291-310 (2015), https://doi.org/10.1146/annurev-soc-073014-112326

between incarceration and a divers set of health conditions. For example, incarceration is associated with high levels of self-reported and the experience of incarceration (exposure) generally has a greater effect on health than the length of incarceration. Aside from general health conditions such as physical functioning, studies in this area have considered various distinct conditions, including infectious disease, cardiovascular disease, and formerly incarcerated person have an elevated risk for these chronic health conditions compared with the general population.[6]

Mr. Escoto's mental health difficulties, especially in conjunction with some of the other stressors placed on the body because of incarceration, can also justifiably enter this Court's sentencing decision. *See, e.g., United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (A defendant's age, his prior minimal criminal record, and his medical condition are all valid considerations at sentencing because they relate to the history and characteristics of the defendant); *United States v. Foster*, 2012 WL 2863252, *5(N.D. Ill. 2012) ("At his original sentencing hearing, the Court found Foster's health concerns and his desire to rehabilitate his life to be mitigating factors taken into account pursuant to Section 3553(a).").

The United States Sentencing Commissions Report on *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), also supports Mr. Escoto's request for a lesser sentence. The findings of the Sentencing Commission's report, Figure 14, shows that the reconviction rate, at age of release, is highest among offenders younger

---

[6] *Id.*

than twenty-one, at 48.5%, and those between the ages of twenty-one to twenty-four years old at 48.4% and declined in each subsequent age grouping, with those who are between 35 and 39 years old at time of release being at 31.3%. Figure 15 of the report shows that the reincarceration rate was highest among those between the ages of 21 to 24 years old (38.6) and declined in each subsequent age group, with those between the ages of 35 to 39 years old at 24.2%. Figure 25 compares the rearrest rate for federal and state offenders by age at release. In the 35 to 39 years age grouping federal offenders were rearrested at a rate of 44.5% while state offenders were rearrested at a rate of 78.1%.[7] The report also shows that time to reincarceration expands with age and severity of reincarceration offense declined with age.[8]

Another commission report, *Measuring Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004), Ex. 9 shows that those in the 31 to 35 age group, at the time of sentencing, who fall in criminal history category I, have a recidivism rate of 14.6%, as compared to those, for example, in the 21 to 25 years of age bracket who recidivate at a rate of 70.1% and those under age 21 who recidivate at a rate of 60.1%.[9] Additional research performed by the United States Sentencing Commission in this report also shows that the recidivism rate for those similarly situated to Mr. Escoto, whose primary sentencing guideline is in the other

---

[7] *Id.* at page 27
[8] The Effects of Aging on Recidivism Among Federal Offenders (Published Dec. 7th, 2017) can be found at: www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders , at page 23.
[9] The Sentencing Commission's report, including Exhibit 9, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.

13

category are least likely to commit further offenses than those convicted under any other sentencing guideline, other than fraud defendants, as their primary sentencing guideline.[10]

### 3. Mr. Escoto's History and Characteristics

Mr. Escoto's history and characteristics warrants a sentence of two-hundred-forty-months in this case. Mr. Escoto's conduct in this case is an aberration from the life that he has led these past twenty-five years. Nothing that Mr. Escoto proffers in this sentencing memorandum is intended to justify or excuse his conduct-because indeed, nothing can justify or excuse his conduct, and Mr. Escoto would be the first person to acknowledge this fact. However, until the instant conduct, Mr. Escoto was a law-abiding citizen with minimum contact with the criminal justice system, with no criminal convictions, and minimal police contact.

Despite his arrest, and imminent incarceration, Mr. Escoto's family remains the loving and supportive family they have always been, rallying around Mr. Escoto in the hopes that they will be able to assist him when he is released in his attempts in regaining a semblance of the life he lived, and to assist him in whichever way they can, in preventing this conduct from occurring again.

Another factor that Mr. Escoto would like this court to consider in fashioning a sentence is his outstanding work history. As documented in the draft PSR, Mr. Escoto is a hard-working young man who began working as a teenager to help his

---

[10] The Sentencing Commission's report, including Exhibit 11, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.

family financially and has worked at a number of different positions. Although he was no longer employed when he was arrested, he was in the process of looking for new employment and was confident that he would be employed soon after looking. Courts have recognized that employment history is a valid justification for a below-guideline sentence. *See, Kimbrough v. United States*, 552 U.S. 85, 110 (2007) ("…second, the [district] court considered Kimbrough's 'history and characteristics.' § 3553(a)1) . . . [noting] that Kimbrough had no prior felony convictions, that he had served in combat during Operation Desert Storm and received an honorable discharge from the Marine Corps and that he had a *steady history of employment"*) (emphasis added).

As in *Kimbrough*, Mr. Escoto's work history, coupled with other factors like his age, family support, and possible negative institutional experiences if incarcerated, are all valid reasons that justify a sentence of two-hundred-forty months for Mr. Escoto.

### 4. *The Context of the Offense*

Mr. Escoto does not, in anyway, justify or excuse his conduct but believes that this Honorable Court's understanding of the context of his offense will assist this Court in its sentencing decision. Mr. Escoto enjoyed a relatively normal, heterosexual, lifestyle and it was never his intention to become involved with an underage girl. In trying to explain what happened Mr. Escoto states: "I couldn't tell you how it happened. We were friends at work and would talk to each other about stuff that was going on in our lives. I know that I was struggling with depression because of the

15

situation that I was in at home, but I wasn't looking for a replacement. I never thought that we would end up doing what we did. We were only involved for a couple of months, at most. What I did was wrong, and I am sorry. I'm willing to do treatment, counseling, or anything else that is recommended. I know I need it. I'm ashamed and I have so much guilt. I'm disappointed in myself and I feel horrible about what I did to her."

Sadly, research has shown that the likelihood of committing a sexual abuse act increases when you have been sexually abused yourself. Mr. Escoto recalls being sexually molested by an older neighbor when he was six years old. "I was touched by a neighbor, she performed oral sex on me, twice. I don't remember all the details, but I know that I never told anyone about it."[11]

### 5. *The Low Risk of Recidivism*

At the request of undersigned counsel, Dr. Marele Orozco, Psy. D. conducted an evaluation to determine whether she could provide an estimate of the risk of recidivism for Mr. Escoto. Dr. Orozco opined that Mr. Escoto is considered a **below average-Level II low risk** to commit future sexual offenses, either a contact or pornography offense. In addition, Mr. Escoto **does not seem to warrant high levels of intervention currently** and is amenable to psychoeducation and treatment. The report also indicates that Mr. Escoto has many protective factors that will help guard against re-offense.[12]

---

[11] See Exhibit 1, Sealed
[12] *Id.*

16

Given his low-risk category and the numerous protective factors cited in the report, a sentence of two-hundred-forty months of incarceration followed by fifteen years of supervised release is more than sufficient to satisfy the § 3553(a) requirements. The supervision should include mental health treatment and sex offense specific treatment.

### *Conclusion*

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

Courts are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a). Mr. Escoto respectfully requests this Court to follow that tradition and impose a sentence of two-hundred-forty months to be followed by a term of supervised release of fifteen years. This sentence is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in § 3553(a).

### *Requests for Recommendations*

Mr. Escoto respectfully requests this Honorable Court to recommend that he be housed in a facility as close to the Southern District of Florida as possible so that

17

it will be easier to maintain family visitation. Mr. Escoto also respectfully request that this Court recommend mental health counseling.

Respectfully submitted,

HECTOR DOPICO
INTERIEM FEDERAL PUBLIC DEFENDER

By:   *s/Kafahni Nkrumah*
Kafahni Nkrumah
Assistant Federal Public Defender
Special Bar ID #A5502967
109 North Second Street
Fort Pierce, Florida 34950
Tel:  772-489-2123
E-Mail: Kafahni_Nkrumah@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on August 9, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   *s/Kafahni Nkrumah*
Kafahni Nkrumah